

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00112-CR

_____

AERRON DOWDY, Appellant

V.

The State of Texas

---

On Appeal from County Criminal Court No. 4
Denton County, Texas
Trial Court No. CR-2017-02661-D

---

Before Gabriel, Pittman, and Bassel, JJ.
Memorandum Opinion by Justice Pittman

# MEMORANDUM OPINION

Appellant Aerron Dowdy appeals from his conviction for possession of more than two but less than four ounces of marijuana. Police officers arrested Appellant because he was in a car in which marijuana was found. They stopped the car in which he was a passenger because he was black and was wearing a white t-shirt and because earlier that evening officers had unsuccessfully attempted to stop a different, physically-dissimilar black male who was also wearing a white t-shirt, for suspected possession of marijuana. At the conclusion of Appellant's trial, the jury foreman orally pronounced a verdict of guilty, but the trial court accepted the verdict form unsigned.

In three issues, Appellant argues (1) that the jury did not render a verdict, (2) that the evidence was insufficient to support a guilty finding, and (3) that the trial court's errors are either harmful or not subject to a harmless error review. Because we sustain Appellant's challenge to the sufficiency of the evidence to support the verdict, we reverse the trial court's judgment and render a judgment of acquittal.

## BACKGROUND

At trial, the State called two police officers with the University of North Texas police department: Corporal Pete Uranga and Officer Cory Lane.

Corporal Uranga testified that on February 7, 2017, he was working the night shift. He started the evening working on bike patrol around 6:00 p.m. As he was leaving the police station on his bike, Officer Lane was also leaving the station but

2

was driving a police vehicle. The two stopped at the intersection of Kendolph Street and Eagle Drive. A white Impala stopped at the intersection and turned south onto Kendolph, and as the Impala passed the officers, they both noticed the smell of marijuana coming from its window. Lane also noticed that the Impala's registration had expired.

Corporal Uranga made a u-turn to follow the Impala. The car turned into a grocery store parking lot and pulled into a parking space. Corporal Uranga pulled up behind the vehicle on his bicycle, turning on his bike's flashing lights as he did so. As he was about to dismount his bike, the Impala "took off."

Corporal Uranga radioed that the Impala had left and began pursuing the vehicle. Officer Lane had pulled into the parking lot to assist Corporal Uranga with the stop, and he too pursued the Impala. When the Impala did not stop, Lane had to "stand down" because department policy discourages pursuit of vehicles except when the pursued person has committed a "known felony." However, another officer heard the call over the radio, saw the vehicle, and followed it until it stopped at the Arbor Apartments. That officer vaguely described the driver as a black male wearing a white t-shirt, and Corporal Uranga described him the same way. The officer stated over the radio that he had the Impala's two passengers but that the driver had fled the scene.

Lane arrived at the scene and participated in the search of the Impala. He found an envelope with a local address of 707 Bernard, Apartment 12, at a nearby

apartment complex. Corporal Uranga biked to that address in case the driver returned home after fleeing the stop.

Corporal Uranga saw three white males standing outside Apartment 12, and as he approached them, one of the men stayed, another one (also wearing a white t-shirt) ran off, and the third walked away. Another officer stopped the one who had run away, and after questioning the men, the officers decided that the men were waiting to buy marijuana from someone who lived in Apartment 12. Nevertheless, the officers let the men go because they "had nothing on them."[1]

Corporal Uranga decided to surveil Apartment 12 from a hilly area to see if the occupant returned. He could see the doors of neighboring apartments, but a six-foot brick wall, which separated the apartment buildings from the parking lot, blocked his view of the door to Apartment 12. At some point, he saw a black male in a white t-shirt coming from the area around the brick wall into the parking lot. Corporal Uranga testified at trial that he did not see the man come out of Apartment 12 and did not see where he came from but that he could at least say that the man did not come from one of the neighboring apartments to Apartment 12 because he could see those doors.

Corporal Uranga left his surveillance spot and went into the parking lot but in doing so lost sight of the man. The apartment complex sits between two roads

---

[1]*See generally Rivas v. State*, 787 S.W.2d 229, 233 (Tex. App.—Corpus Christi 1990, pet. ref'd) (discussing what the state must show to prove the offense of attempted possession of a controlled substance).

running east-west, and its parking lot has entrances on both its north and south side, providing access to both roads. Corporal Uranga headed toward the street on the north side of the parking lot to look for the man and, after failing to find him, went back into the parking lot. As he did so, he saw a maroon Hyundai back out of a parking space and drive toward him. He had not seen the car from where he had been watching Apartment 12 although he had passed its parking space when he had gone toward the street. A woman drove the car, and a black man in a white t-shirt was in the front passenger seat. The man was later identified as Appellant. However, Corporal Uranga could not say if Appellant was the man he had seen going into the parking lot because he had seen that man only from a distance.

As the car drove past Corporal Uranga, he shined his flashlight on the car and said, "[H]old up," but the driver did not stop. Corporal Uranga did not detect any odor of marijuana as the car passed him, but the car's windows were up. Corporal Uranga tried but was unable to activate his bike's flashing lights. At trial, he testified that he believed that the driver was evading him. However, he further stated that because it was dark outside, he was not sure if the driver saw his uniform to know that he was a police officer or if she was aware that he was attempting to detain her.

Corporal Uranga followed the car on his bike. Officer Lane was on his way to the scene because Corporal Uranga had reported that he had seen a black male leaving

Apartment 12.[2]  After Corporal Uranga reported that the Hyundai's driver had turned left at a stop sign without stopping, Officer Lane caught up to the car and turned on his flashing lights to stop it.  When the car stopped, officers ordered the driver and passenger to put their hands out their respective windows.  The car's occupants complied; Officer Lane did not see Appellant's hands go back into the vehicle at any point before being ordered out of the car.

Corporal Uranga caught up to the stopped car as the driver and passenger were following the officers' instructions to get out of the car.  Corporal Uranga had not seen the face of the Impala's driver, but Officer Lane had seen enough of him to know that the Impala's driver had an Afro—Appellant was bald—and was noticeably shorter than Appellant and thus to know that Appellant was not the Impala's driver. This was later confirmed after a search warrant was executed on Apartment 12.  At trial, Corporal Uranga admitted that Appellant and the Impala's driver did not look alike.  But he asserted that the person he saw coming from around the wall near Apartment 12—who he could not identify as Appellant—matched the Impala's driver "in certain ways":  both were black men who happened to be wearing white t-shirts.

Officers searched the Hyundai.  Officer Lane testified that he noticed a marijuana smell when he "peeked into the car" and also testified that he could smell it

---

[2]Contrary to the State's assertion in its brief, Corporal Uranga did not see Appellant or anyone else actually leave Apartment 12.  He acknowledged at trial that he could not see the apartment's door, that he could not say who he saw coming from around the brick wall by the apartment, and that that it was not his testimony that it was Appellant.

6

when he approached the car after the occupants had been removed and both doors opened. Officer Lane and another officer found marijuana in a yellow fanny pack in the glove compartment, as well as a cigarillo wrapper containing marijuana. The marijuana, which cumulatively weighed 2.8 ounces, was in "multiple little smaller bags [of what] . . . looked to be closely equal amounts." They also found $1,000 in cash underneath the passenger seat.

Appellant was arrested and charged with marijuana possession. Officer Lane testified that they did not arrest the Hyundai's driver for possession because they were already charging her with evasion and because—despite her owning and driving the car that, according to the officers, smelled of marijuana—there was no evidence linking her to the drugs. He did not ask her if she knew that the drugs were in the glove compartment, and he testified that he had no evidence to prove that either she or Appellant knew the drugs were there. Officer Lane testified that other than the drugs' location, he had no evidence that Appellant had control of the drugs and no evidence that the cash in the car was related to drug activity.

Officer Lane stated that they linked Appellant to the drugs in the glove compartment based on Corporal Uranga's statement that he had seen Appellant near Apartment 12—a location that, based on the search of the Impala, the officers linked to drug activity. In fact, however, Corporal Uranga could not say whether Appellant was the person he saw near Apartment 12.

Appellant's attorney demonstrated at trial that Officer Lane could not smell the marijuana seized from the car if it was more than four inches away from him, contradicting his statement that he could smell the marijuana from outside the car or when he looked inside. On cross-examination, however, he testified that in the courtroom, the bag the drugs were stored in was a heat-sealed bag, whereas when found in the Hyundai, they were in closed zip-top bags, which were then placed in a larger unsealed zip-top bag and then placed in the fanny pack that was in the closed glove compartment.

After deliberating, the presiding juror read the verdict to the court, stating that the jury found Appellant "guilty in the offense of possession of a usable quantity of marijuana in the amount of 4 ounces or less but more than 2 ounces." When asked by the trial court, the presiding juror stated that the verdict was unanimous. Upon Appellant's request, the trial court polled the jury, and each juror stated that their verdict was "guilty." The trial court accepted the verdict. However, the presiding juror left the verdict form blank.

## SUFFICIENCY OF THE EVIDENCE

Because it is dispositive, we begin with Appellant's second issue challenging the sufficiency of the evidence to support his conviction.

## I.  Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct.

8

2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

## II.    The Evidence Is Insufficient to Support Appellant's Conviction.

### A.    The State Had to Link Appellant to the Drugs Through More Than Mere Presence.

In order to establish possession of contraband, the State must prove that the defendant (1) exercised care, custody, control, or management over the contraband, and (2) knew that the matter possessed was contraband. *See* Tex. Health & Safety Code Ann. §§ 481.002(38) (defining possession), 481.121 (providing offense for knowing or intentional possession of a usable quantity of marijuana); *Deshong v. State*, 625 S.W.2d 327, 329 (Tex. Crim. App. 1981); *Harris v. State*, 532 S.W.3d 524, 531 (Tex. App.—San Antonio 2017, no pet.).

A defendant's mere presence in the same place where the contraband is being used or possessed does not support a possession finding. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex. Crim. App. 1985) ("'[P]ossession' means more than being

9

where the action is; it involves the exercise of dominion and control over the thing actually possessed"); *Allen v. State*, 249 S.W.3d 680, 697 (Tex. App.—Austin 2008, no pet.). Rather, the State must link the defendant to the contraband with evidence of additional facts and circumstances indicating the defendant's knowledge and control of the contraband. *Allen*, 249 S.W.3d at 697.

## B. The State Did Not Link Appellant to Apartment 12.

The State put on some evidence linking Apartment 12 to narcotic activity: the police stopped a car in which they found both drugs and an envelope with the Apartment 12 address. But the evidence did not link Appellant to Apartment 12. Corporal Uranga testified that he saw a black man in a white t-shirt come from behind the brick wall near Apartment 12 and go into the parking lot—a parking lot with exits on both its north and south sides—but did not see where that man went after that. Corporal Uranga did not describe the man, other than stating that he was black and—like the Impala's driver and one of the men he questioned outside Apartment 12—wearing a white t-shirt. Not long after, he saw Appellant sitting as a passenger in a Hyundai that was driving toward the parking lot's exit. Appellant was wearing a white t-shirt. Corporal Uranga did not know if Appellant was the man he saw near Apartment 12, did not see Appellant get into the car, and did not know how long the car had been in the parking lot.

This evidence is insufficient to create a reasonable inference that Appellant was linked to Apartment 12. Accordingly, evidence linking Appellant to the drugs in the

10

Hyundai cannot be based on any connection between Apartment 12 and narcotic activity and could be based only on Appellant's presence in the car.

### C. The State's Evidence Did Not Establish Appellant's Care, Custody, Control, and Management of the Contraband.

The State argues that the evidence established facts and circumstances that link Appellant to the drugs in the car. *First*, it points out that Appellant was present at the time of the search, i.e., Appellant and the drugs were in the same place at the same time, which, as the State acknowledges, is not enough to establish possession. *See Hargrove v. State*, 211 S.W.3d 379, 385 (Tex. App.—San Antonio 2006, pet. ref'd) (stating that when the defendant is not in exclusive possession of the place where contraband is found, additional independent facts and circumstances must link the defendant to the contraband in order to raise a reasonable inference of the defendant's knowledge and control of the contraband); *see also Allen*, 249 S.W.3d at 697; *cf. Damron v. State*, 570 S.W.2d 933, 936 (Tex. Crim. App. 1978) (holding evidence did not link Appellant to narcotics found in the house he lived in when the evidence showed, among other things, that the defendant was not at home at the time of the search and that "there were other persons present at the time of the search and shown to be living there so [the defendant] was not in exclusive possession"). *Second*, "the marijuana was in close proximity to or accessible by Appellant" because he was in the front passenger seat and the marijuana was in the glove compartment. *See Le v. State*, 479 S.W.3d 462, 468 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (noting that the

appellant had access to and control over the truck where drugs were found). *Third*, "there was an odor of the contraband present at the scene," which could alert Appellant to the marijuana's presence. *See Christopher v. State*, 639 S.W.2d 932, 935–36 (Tex. Crim. App. 1982) (stating that the fact that odor of marijuana could be detected outside the cab of a pickup truck "suggests that the [defendant] would become aware of the existence of the [drug] before entering the cab"), *overruled on other grounds by Preston v. State*, 700 S.W.2d 227 (Tex. Crim. App. 1985). *Fourth*, the glove compartment where the marijuana was found was an enclosed place. *See Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005) (concluding that the appellant exercised care, custody, control, and management over drugs found hidden in the appellant's home in a space that was accessible to the appellant as a resident but *not* accessible to a casual visitor, when there was no evidence that would support a conclusion that the appellant was an innocent bystander to someone else's drug operations within his own home), *overruled on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 & n.32 (Tex. Crim. App. 2015). And *fifth*, Appellant was in possession of $1,000, "a large amount of cash." *See Abdel-Sater v. State*, 852 S.W.2d 671, 676 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (stating that "[i]f the amount of money found in appellant's possession is more than would normally be carried by an individual, it might be indicative of dealing in narcotics"). The State argues that this evidence links Appellant to the marijuana in the glove compartment "and provides sufficient logical force for the jury to have concluded beyond a

12

reasonable doubt that Appellant possessed the marijuana." *See Chavez v. State*, 769 S.W.2d 284, 288 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd) (listing various links between a defendant and contraband that may establish a defendant's care, custody, and control of the contraband when the defendant is not in sole possession of the location where the contraband is found); *see also Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006) (stating that when looking at links[3] between the defendant and the contraband, it is "not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial").

### 1.      Presence and Proximity

When arrested, Appellant was in the same place as the marijuana.  As noted above, that fact alone is not enough to establish possession.  *See Hargrove*, 211 S.W.3d

---

[3]Courts have considered the following possible "links" in determining whether the evidence is sufficient to show possession of a narcotic:

> (1) whether the defendant was present when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether at the time of the arrest the defendant was under the influence of narcotics, (5) possessed other contraband or narcotics, or (6) made incriminating statements; (7) whether the defendant attempted to flee; (8) whether the defendant made furtive gestures; (9) whether there was an odor of contraband; (10) whether other contraband or drug paraphernalia were present; (11) whether the defendant owned or had the right to possess the place where the drugs were found; (12) whether drugs were found in an enclosed place; (13) whether the defendant was found with a large amount of cash; and (14) whether the conduct of the defendant indicated a consciousness of guilt.

*Evans v. State*, 202 S.W.3d 158, 161 n.4 (Tex. Crim. App. 2006).

at 385. Nor is proximity alone enough; rather, it must be determined whether his proximity, in combination with other evidence, is enough to show possession. *See Harris*, 532 S.W.3d at 531; *Allen*, 249 S.W.3d at 697 ("Mere presence of an accused at a place where contraband is found, even in close proximity thereto, does not in itself justify a finding of joint possession."). We therefore must look at the other facts and circumstances that could support a finding of possession.

### 2. The Marijuana Odor

Officer Lane's testimony was evidence from which the jury could believe there was a marijuana odor somewhere in the car. That odor could have alerted Appellant to its presence, *see Christopher*, 639 S.W.2d at 935–36, assuming of course that Appellant was familiar with its odor—an assumption for which there was no evidence. Because being aware of someone else's possession of contraband does not make a person a joint possessor of the contraband, Appellant's assumed awareness of the existence of marijuana in the car could not, by itself, demonstrate that Appellant had care, custody, and management of it. *See McGoldrick*, 682 S.W.2d at 578 ("[M]ere presence alone at a place where narcotics or dangerous drugs are being used or possessed by others does not justify a finding of joint possession."); *Allen*, 249 S.W.3d at 697 ("The mere presence of an accused at place where contraband is being possessed or used by others, and even the accused's knowledge of an offense by others, does not constitute joint possession of the contraband.")

### 3. The Contraband Was in An Enclosed Space.

The State cites the fact that the drugs were in an enclosed space as evidence showing possession without discussing why courts consider such evidence as linking contraband and a defendant and without discussing whether that reasoning applies here. Contraband's location in an enclosed space is evidence of possession when it has been hidden in a secret location accessible to or likely to be used by the defendant but not an innocent party. For example, in *Poindexter*, the Texas Court of Criminal Appeals pointed out that the contraband hidden in the defendant's home in a space that was accessible to the defendant as a resident but *not* accessible to a casual visitor was not evidence that would support a conclusion that the defendant was an innocent bystander to someone else's drug operations within his own home. *See* 153 S.W.3d at 406 (concluding that the defendant exercised care, custody, control, and management over drugs found hidden in his home).

Here, Appellant was not driving the car when it was stopped. He did not own the car. While the glove compartment in this case was accessible to Appellant as a passenger—assuming it was unlocked, a point on which no evidence was presented at trial—it was not more accessible to Appellant than the car's owner. There was no evidence of how long Appellant was in or had access to the car other than the short time between when Corporal Uranga saw the car leaving its space and when Officer Lane stopped it. The only evidence showing any connection between Appellant and the car was in Corporal Uranga's body cam video; on the video, the driver stated that

15

she went to the apartment complex to pick up a friend. Assuming that friend was Appellant, however, the video was not shown to the jury. There was no evidence that Appellant had any right of possession to the car or that established his link to the car other than that he was in it when the police stopped it.

The police had the driver step out of the car first, leaving Appellant alone in the car, but they had Appellant keep his hands outside the window during that time period. There was no evidence that he touched the glove compartment—for example, there was no evidence of his fingerprints on the glove compartment or on the fanny pack or any of the bags inside it. *See Barbosa v. State*, 537 S.W.3d 640, 646 (Tex. App.—San Antonio 2017, no pet.) (noting that despite the defendant's assertion that he did not possess the drugs found in a vehicle and that he had no access to the vehicle, his fingerprints were found on the cellophane wrapping the drugs); *see also Lassaint v. State*, 79 S.W.3d 736, 745 (Tex. App.—Corpus Christi 2002, no pet.) (discussing different scenarios involving fingerprint evidence in possession cases and holding that in that case the defendant's fingerprints on a shopping bag holding smaller bags of drugs did not establish a connection between the defendant and the drugs when someone else's fingerprints were on the smaller bags but the defendant's were not). There was no testimony that any officer saw Appellant make any furtive gestures or movement toward the glove compartment.

Given the evidence at trial, the fact that the glove compartment is an enclosed space does not give rise to a reasonable inference that the drugs were under

16

Appellant's care, custody, control,and management, even assuming he could tell by the car's odor that drugs were in the car. *See Allen*, 249 S.W.3d at 694, 697 (stating that when contraband is found hidden or secreted, the State must address whether the accused knew of the existence of the secreted place and its contents and that knowledge that others in the place have committed an offense does not show possession).

### 4. The Cash

A defendant's possessing cash in a "large amount" can be evidence of narcotic activity because, when combined with other evidence, it can show that the defendant is involved in buying or selling drugs. *See, e.g.*, *Carr v. State*, No. 08-11-00315-CR, 2013 WL 5873299, at *1 (Tex. App.—El Paso Oct. 30, 2013, pet. ref'd) (not designated for publication) (noting officer's testimony that "it was sometimes common for drug dealers to have large amounts of cash on them depending on whether they have just bought or sold drugs"). The phrase "large amount" is amorphous. *Compare Soliz v. State*, No. 12-18-00040-CR, 2019 WL 1142473, at *4 (Tex. App.—Tyler Mar. 12, 2019, no pet.) (mem. op., not designated for publication) ("Appellant was found to be in possession of $540, **a substantial amount** of cash.") (emphasis added), *with Jones v. State*, No. 01-14-00385-CR, 2015 WL 4591745, at *2 (Tex. App.—Houston [1st Dist.] July 30, 2015, no pet.) (mem. op., not designated for publication) ("Harrington also seized from appellant's pockets approximately $507 in cash, which, although **not a large amount**, was a 'decent amount of cash to have on a person.'") (emphasis

17

added); *see also Evans*, 202 S.W.3d at 165 (stating that the defendant's having $160 had some slight probative value in connecting him to care or custody of drugs). "The amount of cash must be viewed in conjunction with the surrounding circumstances to determine whether it is a large quantity." *See Torres v. State*, 466 S.W.3d 329, 333–34 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *cf. Evans*, 202 S.W.3d at 165 (stating that defendant's having $160, viewed in a vacuum, was "hardly dispositive" but that evidence showed defendant did not have a job, and concluding that when combined with other evidence that he was found sitting next to $1,300 worth of contraband in plain view, the $160 had slight probative value in connecting him to the contraband); *In re A.P.*, 512 S.W.3d 602, 609 (Tex. App.—El Paso 2017, no pet.) (stating in juvenile proceeding that fifteen-year-old A.P.'s having $140 was evidence of a link with the drug operation going on in the house he had been arrested in).

Here, the only evidence linking the cash to Appellant was that it was under his seat. He was not alone in the car, it was not his car, and there was no evidence that he was the one that put the cash there; no officer testified, for example, that they saw him make any movements consistent with putting the cash under the seat.

Assuming the jury could infer that the cash belonged to Appellant based solely on its location, the jury heard no evidence that the cash was related to criminal activity. *See Willis v. State*, No. 02-16-00163-CR, 2017 WL 4819375, at *9 (Tex. App.—Fort Worth Oct. 26, 2017, no pet.) (mem. op., not designated for publication) ("[M]oney found in close quarters with controlled substances . . . do[es] not alone

18

provide evidence of the nexus between money and the sale or distribution of a controlled substance."). Moreover, the jury heard no testimony that having that much cash was consistent with drug activity. *Contra Thomas v. State*, No. 05-12-01119-CR, 2013 WL 5786087, at *3 (Tex. App.—Dallas Oct. 28, 2013, pet. ref'd) (not designated for publication) (noting testimony of officer that "the denominations of money found at the house were consistent, based on his training and experience, 'with street denominations used in drug sales'"). Further, there was no testimony that the cash was in denominations used in drug sales or in increments consistent with drug sales. *See id.*; *Williams v. State*, No. 01-11-00017-CR, 2012 WL 2357416, at *8 (Tex. App.—Houston [1st Dist.] June 21, 2012, pet. ref'd) (mem. op., not designated for publication) (noting that two officers testified that large amounts of cash bundled in thousand-dollar increments was consistent with money obtained through drug dealing). Also, the State did not put on evidence that Appellant had no job or other evidence that the money may not have come from a legitimate source. *Contra Carroll v. State*, 266 S.W.3d 1, 3 (Tex. App.—Waco 2008, pet. ref'd) (holding that sufficient evidence supported jury's finding that defendant possessed cocaine when, among other evidence, he was arrested with $628 in cash in his pocket despite being unemployed). Instead, the only testimony related to cash and criminal activity was Officer Lane's testimony that he personally thought that $1,000 was a lot to carry but that carrying cash alone does not give probable cause to arrest someone and is not an

19

indication of criminal activity, that he did not know where the cash came from, and that he had no evidence that the cash was at all related to any criminal activity.

### 5. The Combined Evidence Does Not Sufficiently Link Appellant to the Contraband.

None of the facts or circumstances relied on by the State are sufficient on their own to show either sole possession or joint possession with the driver. However, in determining whether evidence is sufficient to show an offense, we do not look at the evidence in isolation; rather, we review the combined pieces of circumstantial evidence, coupled with reasonable inferences from them. *Evans*, 202 S.W.3d at 166; *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006). We thus summarize all of the circumstantial evidence from the record that is relevant to linking Appellant to the drugs found in the Hyundai.

Appellant was a passenger in a car in which drugs were found. There was an odor of marijuana that was detectable somewhere in the car or possibly outside of it (assuming the jury believed Officer Lane's testimony that the heat-sealed bag the drugs were stored in at trial explained why he could not smell the marijuana half a foot away from him in the courtroom). This odor, assuming that Appellant was familiar with the odor of marijuana, could have alerted him to its presence in the car. However, the drugs were not in plain view to confirm their presence. And neither were they secreted away in a location giving rise to the reasonable inference that Appellant, as opposed to the driver or some other person, was responsible for putting

the drugs there. Appellant was sitting close enough to the glove compartment that he was physically capable of doing so, but there was no testimony or other evidence suggesting that he did so. There was no evidence that police found Appellant's fingerprints on the glove compartment or on any of the bags holding the drugs. There was $1,000 under the seat on which Appellant had been sitting, but there was no evidence of where the money came from or to whom it belonged. There was no evidence, other than the existence of drugs in the glove compartment, suggesting that the money came from the sale of drugs. Appellant did not own the car and was not driving it. There was no evidence showing how long Appellant had been in the car.

The State did not have to disprove all other reasonable alternative hypotheses inconsistent with Appellant's guilt. *See Wise v. State,* 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). But it did have to prove beyond a reasonable doubt that not only would it have been possible for Appellant to exercise care, custody, control, and management of the drugs but that he actually did so. Under the specific circumstances of this case, while the facts may be suspicious, the State did not sustain its burden of proof that Appellant committed the charged offense, and we cannot conclude that a rational trier of the facts could have found the essential elements beyond a reasonable doubt. *See McGoldrick*, 682 S.W.2d at 580. We sustain Appellant's second issue, which is dispositive. Accordingly, we do not reach Appellant's first issue challenging whether the jury's oral finding of guilt constitutes a verdict or his third issue asserting harm.

21

## CONCLUSION

Because the evidence is insufficient to support appellant's conviction, we reverse the trial court's judgment and render a judgment of acquittal. *See* Tex. R. App. P. 43.2(c), 51.2(d); *Greene v. Massey*, 437 U.S. 19, 24–25, 98 S. Ct. 2151, 2154–55 (1978); *Burks v. United States*, 437 U.S. 1, 16–18, 98 S. Ct. 2141, 2150–51 (1978); *Winfrey v. State*, 393 S.W.3d 763, 774 (Tex. Crim. App. 2013).

/s/ Mark T. Pittman

Mark T. Pittman
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 30, 2019